## CENTRAL R. CO. OF NEW JERSEY v. UNITED STATES PIPE LINE CO.

(Circuit Court of Appeals, Third Circuit. September 30, 1924.)

No. 3053.

1. **Contracts ⊗⟐107—Contract made unlawful by a statute is void.**

A contract made for or about any matter or thing which is prohibited and made unlawful by any statute is void, though the statute itself may not expressly so provide, but only inflicts a penalty on the offender.

2. **Carriers ⊗⟐35—Contract for rates differing from published rates void.**

A contract between an interstate carrier and a shipper fixing rates differing from its published rates filed with the Interstate Commerce Commission, which is prohibited by Interstate Commerce Act, §§ 2, 6 (Comp. St. §§ 8564, 8569), is void.

3. **Carriers ⊗⟐35—Right to recover on contract cannot be predicated on presumption that carrier complied with the law.**

In an action by a carrier based on a contract with a shipper, the legality of which depends on whether plaintiff had published a schedule, as required by law, establishing the rates specified in the contract, it has the burden of proving such fact, and the validity of the contract cannot rest on the presumption that it did so.

4. **Carriers ⊗⟐35—Contract, one provision of which required carrier to carry shipments at less than legal rates, held illegal and void.**

A contract between a railroad company and a pipe line company, by which the latter was granted right of way for its pipe line over the railroad right of way, in consideration for which it agreed to ship a stipulated tonnage of oil over the railroad in interstate commerce at a fixed rate, which was less than the published rate, held indivisible and illegal and not enforceable by either party.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action at law by the Central Railroad Company of New Jersey against the United States Pipe Line Company. Judgment for defendant, and plaintiff brings error. Affirmed.

For opinion below, see 290 Fed. 983.

Arthur G. Dickson, of Philadelphia, Pa., and Charles E. Miller, of New York City, for plaintiff in error.

Eugene Mackey, of New York City, and Owen J. Roberts, of Philadelphia, Pa., for defendant in error.

Before WOOLLEY and DAVIS, Circuit Judges, and BODINE, District Judge.

DAVIS, Circuit Judge. The Central Railroad Company of New Jersey, hereinafter called plaintiff, maintained and operated a railroad between Wilkes-Barre, Pa., and Jersey City, N. J. The United States Pipe Line Company, defendant below and here, had a pipe line in the oil fields of Northwestern Pennsylvania. The pipe line desired to reach tidewater and thought the best way to do so was to construct its line to the right of way of the railroad company and follow it along to Jersey City and tidewater. On December 31, 1892, they entered into a contract whereby the railroad company granted to the pipe line the right to construct, maintain, and operate a pipe line along its right of way from some point on the line of the railroad between Wilkes-Barre and Jersey City to tidewater for a period of 100 years from the time of the completion of the pipe line unless sooner terminated by the pipe line under its reserved option at the end of any five-year period. The pipe line was to be constructed to some point on the line of the railroad on or before January 1, 1894. The pipe line guaranteed the railroad company that there should be transported through its pipes to the line of the railroad company and thence either by pipe or rail to tidewater in New York Harbor, not less than 1,800,000 barrels of petroleum and its products during each of the five years beginning January 1, 1894, and not less than 1,080,000 barrels during each of the succeeding years beginning January 1, 1899. The agreement further provided that:

"In case the shipments over the said railroad of the railroad company, by the pipe company in pipe to tidewater, shall in any calendar year not equal the said guaranteed amounts, then the pipe company will pay to the railroad company for all shortage occurring prior to the time when the pipe line is completed to tidewater in New York Harbor, 40 per cent. of the rail tolls on crude or refined oil from Easton to tidewater in New York Harbor, to be calculated upon the assumption that 50 per cent. of the shortage is in crude and 50 per cent. in refined oil, and for all shortage occurring in any year after the pipe line is completed to tidewater in New York Harbor, the entire rate per barrel which would have been due to the railroad company had such oil been so transported."

The defendant constructed its line to the plaintiff's right of way at Parsons, near Wilkes-Barre, but instead of running its line through and along plaintiff's right of way, it ran it by a shorter route across country to Hampton Junction, N. J. Being prevented by an injunction obtained by the Delaware, Lackawanna & Western Railroad Company from crossing its right of way at or near that point, the defendant abandoned the proposed construction of its pipe line to Jersey City and ran its line to Marcus Hook, Pa., instead. Plaintiff's right of way was therefore never used, and the defendant exercised its option and terminated the contract on December 31, 1903.

The pipe line company was to pay the railroad company as follows:

"(a) From Wilkes-Barre, or any other point on the Lehigh & Susquehanna Division of the railroad company west of Easton, 13 cents per barrel on crude and 15 cents per barrel on refined oil.

"(b) From Easton, 9 cents per barrel on crude and 10 cents per barrel on refined oil.

"(c) From any point on the railroad east of Easton, a mileage prorate of the rate from Easton according to the proportionate distance which such oil is carried by pipe and by rail, provided, however, that the railroad company shall receive for rail transportation not less than 2 cents per barrel in addition to the prorate of pipeage for the distance carried by pipe.

"(d) For transportation by pipe only from Wilkes-Barre or any point west of Easton to tidewater, 4 cents per barrel, and from Easton or any point east of Easton to tidewater in New York Harbor, 3 cents per barrel."

The pipe line was constructed to plaintiff's right of way in 1893, and from that time until the contract was canceled in 1903 shipments were made over the plaintiff's railroad which were paid for at the agreed rate, but the required amount was not shipped in any year. The defendant paid for the deficiency in guaranteed shipments for the year 1894, but they were not paid for any of the succeeding years. There is no dispute as to the deficiencies or the sum due plaintiffs if defendant is liable at all. The sum of the aggregate deficiencies demanded in this suit is $216,852 with interest on the amount demanded for deficiencies for every year from 1894 to 1903, inclusive.

At the conclusion of the evidence, both parties moved for binding instructions, but

before the case was submitted to the jury, they asked to have a juror withdrawn and the cause determined by the court, and this was done. The court found as a conclusion of law that "the contract sued upon is illegal and void" because it violates the Interstate Commerce Act of February 4, 1887 (Comp. St. § 8563 et seq.), in that the agreed toll for which the oil was to be transported was lower than the tariff rates posted by the plaintiff and the plaintiff is here on writ of error.

It was provided in sections 2 and 6 of the act (sections 8564, 8569) in force at the time the contract was made that:

"If any common carrier * * * shall, directly or indirectly, by any special rate * * * or other device, charge, demand, collect, or receive from any person * * * a greater or less compensation for any service rendered, or to be rendered, * * * than it charges, demands, collects, or receives from any other person * * * for * * * like kind of traffic, * * * such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful. * * *

"Sec. 6. When any such common carrier shall have established and published its rates, * * * it shall be unlawful for such common carrier to charge, demand, collect, or receive * * * a greater or less compensation * * * than is specified in such published schedule of rates, * * * [and] every common carrier * * * shall file with the Commission * * * copies of its schedules of rates."

[1] It was declared by Lord Chief Justice Holt in 1693 that every contract made for or about any matter or thing which is prohibited and made unlawful by any statute is void, though the statute itself may not expressly so provide, but only inflicts a penalty on the offender, because a penalty implies a prohibition though there are no prohibitory words in the statute. Bartlet v. Vinor, Carthew, 252. This rule has been generally followed and is the law in the commonwealth of Pennsylvania and in this court. Johnson v. Hulings, 103 Pa. 501, 49 Am. Rep. 131; Pittsburgh Construction Co. v. West Side Belt Railroad Co., 154 Fed. 929, 83 C. C. A. 501, 11 L. R. A. (N. S.) 1145. Section 10 of the Interstate Commerce Act (section 8574) provides that any common carrier subject to the provisions of the act which shall do or cause to be done anything in the act prohibited or declared to be unlawful is guilty of a misdemeanor and upon conviction is subject to both a fine and imprisonment.

The evidence establishes that prior to the execution of the contract the plaintiff had filed with the Interstate Commerce Commission its tariff rates for the transportation of petroleum and its products by rail from Wilkes-Barre to tidewater in New York; that those tariffs remained in effect until after the termination of the contract; and that these posted rates were approximately four times those fixed by the fourth paragraph of the contract. The evidence abundantly sustains the finding of the learned trial judge that:

"The agreed freight tolls to be paid by the defendant to plaintiff for interstate shipments for which the plaintiff's action is brought were not the tolls named in the posted tariff to which both parties to the contract were bound to conform."

[2] The purpose of the act in requiring tariffs containing the rates of carriers to be filed was to secure uniformity, to secure the same treatment to all shippers alike by requiring them to pay one rate as established, published, and posted. To do this requires inflexibility in the enforcement of the act. Louisville & Nashville Railroad Co. v. Dickerson, 191 Fed. 705, 112 C. C. A. 295; New York, New Haven & Hartford Railroad Co. v. York & Whitney Co., 215 Mass. 39, 102 N. E. 366; New York, New Haven & Hartford Railroad Co. v. Interstate Commerce Commission, 200 U. S. 361, 391, 26 Sup. Ct. 272, 50 L. Ed. 515. The contract rates, differing from the published rates filed with the Interstate Commerce Commission, rendered the contract illegal and void. Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 548, 22 Sup. Ct. 431, 46 L. Ed. 679; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; Pittsburgh, C., C. & St. L. R. Co. v. Fink, 250 U. S. 577, 40 Sup. Ct. 27, 63 L. Ed. 1151; New York Central Railroad Co. v. York & Whitney Co., 256 U. S. 406, 41 Sup. Ct. 509, 65 L. Ed. 1016.

[3] The above statement of the law is not disputed, as we understand the brief and argument of the plaintiff, but it contends that the facts in the case bring it under another principle of law, that, "where an act is done which can be done legally only after the performance of some prior act, proof of the later carries with it a presumption of the due performance of the prior act." Knox County v. Ninth National Bank, 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93. Under this principle it contends that while

the evidence did not show that it had filed tariffs with the Interstate Commerce Commission of its contract rates for the transportation of oil from Wilkes-Barre to Jersey City, from the fact that it made those contract rates and received oil for transportation at those rates, it should be presumed as a matter of law that the "plaintiff had legally established said rates and had duly printed and published same"; and that this presumption establishes the legality of the contract. In the case of Knox County v. Ninth National Bank, supra, the Legislature of the State of Missouri passed, an act to incorporate the Missouri & Mississippi Railroad Company (Acts 1865, p. 86), and in section 13 of the act it empowered any county to subscribe to the capital stock of the railroad company and issue bonds therefor and provided the procedure for doing so. In the following year, 1866 (Gen. St. 1866, c. 63), the Legislature passed a general statute in reference to railroad companies, and section 17 empowered any county to take stock in any railroad company organized under the law of the state and provided the procedure to be followed. Both acts provided that the county court of any county might subscribe to the stock, provided two-thirds of the qualified voters of the county at a regular or special election assented to the subscription. Under the later act, the bonds, being issued pursuant to a vote of the people, were payable in full without restriction as they fell due; while under the former act not more than one-twentieth of 1 per cent. of the assessed valuation of the county could be paid in any year. The question at issue was under which act certain bonds were issued. It was contended that a legal election had not been held. There was admitted in evidence an order of the county court directing a special election to be held on February 6, 1867, on the question of subscribing to the bonds. There were also admitted in evidence a record of the canvass of the votes at the election showing 510 votes for and 98 votes against the subscription; an order of the county court of May 13, 1867, authorizing the presiding judge of the court to subscribe for the stock in the name of the county and a certified register of certain leaves of the bond register of the county showing that the bonds issued were "ordered by an election held the 12th of March, 1867." The order for the election directed that notice thereof "be given through the Missouri Watchman, for five weeks, and by printed hand bills publicly exposed throughout the

county." Evidence was not offered of printed handbills or of the publication of notice in the Missouri Watchman, and it was insisted that in the absence of such evidence it could not be presumed notice was given either by handbills or in the newspaper. In commenting on this contention, the court pointed out that the election was held, the votes cast at that election were canvassed by the proper officers, an order was made by the county court for a subscription in accordance with the terms of the order for the election, and from these facts it might be presumed that proper notices for the election were given (25 years before). The court then went on to say, "that when an act is done which can be done legally only after the performance of some prior act, proof of the later carries with it a presumption of the due performance of the prior act." Under the facts of that case such presumption was inevitable. It was only one in a chain of many acts, all of which except that of notice had been performed.

In the case of Cincinnati, New Orleans & Texas Pacific Railway Co. v. Rankin, 241 U. S. 319, 36 Sup. Ct. 555, 60 L. Ed. 1022, a carload of mules was being carried by the railway company from Danville, Ky., to Atlanta, Ga. A wreck occurred at Dayton, Tenn. Some of the animals were killed. Rankin, the shipper, sued the railway company for their actual value of $230 to $240 each and not for the liability of $75 each to which they were limited by the through bill of lading signed by both shipper and carrier. The bill of lading recited that the mules were carried at the lower rate and, "that the tariff regulations of said carrier provide that for every increase of one hundred per cent., or fraction thereof, in the above valuation, there shall be an increase of fifty per cent. in the freight rate; and that the said shipper in order to avail himself of said published freight rates, agrees that said carrier shall not, in any case of loss or damage to said live stock, be liable for any sum in excess of the actual value of said stock at the place and date of shipment, nor for any amount in excess of the rates stated above, which are hereby agreed to be not less than the just and true values of the animals, unless an additional amount is herein stated and paid for."

The declaration denounced as untrue the above statements in the bill of lading concerning published freight rates and tariff regulations. The plea, among other things, averred that the defendant company had duly filed with the Interstate Commerce

Commission and had published and kept open for inspection schedules of joint rates between Danville and Atlanta, which contained classifications of freight in force, separately stating the rates on horses and mules contained in the bill of lading in question. The trial judge charged that where the railway set up as a matter of defense its compliance with the Interstate Commerce Act, there was no presumption in its favor, and the burden was on it to show such compliance. The Supreme Court on review said:

"It cannot be assumed, merely because the contrary has not been established by proof, that an interstate carrier is conducting its affairs in violation of law. Such a carrier must comply with strict requirements of the Federal Statutes or become subject to heavy penalties, and in respect of transactions in the ordinary course of business it is entitled to the presumption of right conduct. The law 'presumes that every man, in his private and official character, does his duty, until the contrary is proved; it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption.'"

The plaintiff attacked in that case the validity of the rates and limited liability set out in the bill of lading on the ground that the defendant company had not complied with the provisions of the Interstate Commerce Act. He was asking affirmative action based upon his declaration. The burden was on him to establish noncompliance with that act. There was a presumption that defendant had complied with the act, and that presumption stood until it was overturned by direct evidence or the circumstances of the case. There was no evidence overturning the presumption and the circumstances directly supported it.

The plaintiff in the case at bar based his suit upon the contract. The right to recovery depends upon its validity, and its validity in turn depends upon compliance by the carrier with the provision of the Interstate Commerce Act. In seeking affirmative action from the court the burden was upon the plaintiff to establish by a preponderance of the evidence that it had the right to recover. This right depended upon a valid contract which had not been performed. The present case differs from those cited to

sustain the principle of law by which it seeks to establish and sustain the presumption giving it the right to recover, in that there was alleged in those the facts constituting the right to recovery, and these facts were sustained by a chain of incontrovertible evidence from which only a link was missing. In the case at bar there is lacking not only an allegation that plaintiff complied with the provisions of the Interstate Commerce Act, but there is not a word of testimony or scrap of evidence to which our attention has been called to establish that fact. "The circumstances of the case" overturn the presumption arising from the mere transportation of oil that the plaintiff had established those rates according to the requirements of the act then in force.

[4] Assuming that the above conclusion is right, plaintiff then contends that the contract is severable, that the legal part may be separated from the illegal; that the plaintiff is not in fact trying to recover unlawful charges, but is suing to recover for this right of way, the amount of which recovery is measured by the contract quantity and rates of oil to be transported. It is true that in a severable contract the legal part may be separated from the illegal and the legal part be enforced. American Railway Express Co. v. Lindenburg, 260 U. S. 584, 589, 43 Sup. Ct. 206, 67 L. Ed. 414. But, as observed by the District Judge, there was in fact only one contract, and the separation of that contract into payments for right of way and payments for the transportation of oil, the former being measured by the latter, seems rather fanciful. As a matter of fact, every part of the consideration for the single contract went equally to the whole promise, and if any part of it is contrary to public policy the whole promise falls. Hazelton v. Sheckels, 202 U. S. 71, 78, 26 Sup. Ct. 567, 50 L. Ed. 939, 6 Ann. Cas. 217. It is public policy and the law that all shippers be treated alike and pay the same rates. Therefore this court cannot sanction the transportation of oil by the plaintiff for the defendant at illegal rates.

The conclusion which we have reached on this one question makes it unnecessary to discuss the others raised by the parties.

The judgment of the District Court is affirmed.